IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                         Case No. 05-40003-01/02-SAC

TANZITARO GUERRERO, and
ALFREDO TORRES,

        Defendants.

MEMORANDUM AND ORDER

Defendants are each charged by indictment with one count of possession with intent to distribute methamphetamine. This case comes before the court on several motions filed by defendants: motion to suppress by defendant Guerrero (Dk. 24); motion to suppress by defendant Torres (Dk. 25); motion to join by defendant Torres (Dk. 26); motion to join by defendant Guerrero (Dk. 37), and motion to dismiss indictment by defendant Torres (Dk. 32). Having reviewed the briefs submitted prior to and after the evidentiary hearing held on May 24, 2005, in light of the evidence presented during that hearing, the court is ready to rule.

**FACTS**

On January 8, 2005, at approximately 12:30 p.m., defendants stopped at a Phillips-66 station in Topeka Kansas. Deputy Brian Rhodd and Sergeant Tom

Bronaugh were in the same vicinity eating lunch at a sandwich shop.  Deputy

Rhodd noticed that the vehicle had California license plates.  When defendants

exited the vehicle, Deputy Rhodd noticed that the passenger, defendant Torres,

appeared to be noticeably older than the driver and that his manner of dress was

distinctively different than the driver's.  Torres was wearing blue jeans and an older,

casual coat, and appeared to be dirty and disheveled, but Guerrero wore dark dress

slacks, dress shoes, a dress shirt, and a heavy coat.  Deputy Rhodd believed

Guerrero's dress attire was inappropriate for the messy and slushy  weather

conditions and was distinctively different from the rest of the public at the gas

station, who were dressed casually and wearing boots suited for the weather

conditions.  The "mismatch" of the two individuals in age and dress attracted the

officer's attention because in his experience as an interdiction officer, persons who

make drug runs often do not know each other but are just hired to ride together

from one point to another to help drive and to deflect suspicion.

        When driver Guerrero went inside the station, Deputy Rhodd

approached Torres, who remained near the vehicle parked at the gas pumps.  The

officer asked Torres if he would be willing to answer a few questions.  Torres has

some ability to speak and understand English, and Deputy Rhodd has some ability

to converse in Spanish, thus the conversation progressed in some English and

some Spanish.  Torres answered the simple questions he was asked without an interpreter, and his responses indicated to Deputy Rhodd that Torres understood the questions he was asked.  Torres stated that he was from Los Angeles, California, that they were on their way to Kansas City, Missouri to work in construction as framers, and that they intended to stay in Kansas City approximately two to three weeks.

Deputy Rhodd considered Los Angeles, California to be a source area for drugs.  During the conversation, Deputy Rhodd observed a large pile of dress slacks and sweaters piled in the back seat, but saw no tools, boots, or clothes indicative of construction work so asked where their tools were.  Torres replied that they would get them in Kansas City.  Because Deputy Rhodd does home construction, he is familiar with the price of tools, and found it unusual that persons from California would come as far as Kansas City for construction work without any tools.  He also found it unusual that dress clothes were not hanging up in the vehicle but were just piled in the back seat as though they had been thrown there, and that there were no work clothes in the pile.

While speaking with Torres, Deputy Rhodd noticed that there was only one key on the key ring in the ignition.  He found this to be an indication that the vehicle was a "throw away car"- one purchased and designed strictly for the

3

purpose of hauling narcotics.  Usually, vehicle key rings are multi-purpose and contain keys other keys, so the fact that this key ring bore only one key raised his suspicions.  He also noticed religious paraphernalia on the gear shift.  In his experience, it was common to find religious items in vehicles of persons transporting drugs.  Some such items are used to assist in praying for protection from the police, and others are used merely as a mask to make it appear that the occupants of the vehicle are "good people."  The officer considered this as another factor pointing toward possible drug trafficking.

Guerrero then exited the store and approached the vehicle.  The deputy asked if Guerrero would speak to him, and  Guerrero, who is fluent in English, admits that he agreed to do so.  Guerrero stated that Torres was his uncle who lived in Kansas City and he was driving Torres there to drop him off. Guerrero did not know how his uncle had traveled to California.  He stated he intended to stay in Kansas City for a day before returning to California, where he was a truck driver for Swift Company.  Deputy Rhodd found some of these statements to conflict with those made by Torres.  He additionally believed it was unusual for a person not to know how his uncle had arrived in California, and unusual to drive such a great distance for just one day's stay.

Deputy Rhodd believed that Guerrero's initial nervousness never

abated during the conversation and that the manner in which Guerrero responded to the questions changed from being initially ill at ease and defensive to being overly polite and cooperative.  This raised the officer's suspicion of criminal activity.

Deputy Rhodd then asked defendants  for their identification and vehicle registration.  Torres produced a Mexican identification card which did not appear to be authentic.  Guerrero produced a valid California driver's license and a valid California vehicle registration.  Deputy Rhodd then asked Guerrero who the vehicle was registered to, and he replied that it was registered to his girlfriend, "Goudimas."  Because the registration was in the name of "Elizabeth Goudima," the officer believed that Guerrero "messed up" her last name.  The officer also testified that defendant Guerrero was attempting to look at the registration when asked whose it was.

The officer then returned to his patrol car to contact dispatch and verify the documentation.  He learned that Guerrero's California license was valid, and that there were no warrants outstanding.  He also contacted the El Paso Intelligence Center (EPIC) and learned that in the two months since the vehicle had been purchased, it had made numerous crossings into Mexico, the last of which was on December 10, 2004.  This raised the possibility that the vehicle had been used for transporting drugs.

5

Deputy Rhodd returned the registration and identifications to defendants and thanked them for their time.  He then walked toward the rear of defendant's vehicle and a couple of seconds after thanking them for their time, asked Guerrero if he would answer "a few more questions."  Guerrero admits that he agreed to this request.  Deputy Rhodd then asked if he was carrying anything illegal such as marijuana, cocaine, methamphetamine, illegal weapons, or large amounts of currency.  When the officer mentioned cocaine and methamphetamine, Guerrero laughed and looked away from him, saying he didn't do that stuff.  The officer found Guerrero's looking away to be deceptive, and at that point believed cocaine or methamphetamine was in the vehicle.  He asked defendant Torres in Spanish if there were drugs in the vehicle, and Torres replied negatively.

Deputy Rhodd then asked Guerrero if he could search the vehicle. Both Deputy Rhodd and Guerrero agree that Guerrero initially replied that it was not his car but was his girlfriend's, so he could not consent to a search. Conflicting testimony was given thereafter.

Deputy Rhodd testified that he believed that Guerrero was trying to distance himself from the vehicle and that he informed Guerrero that since he was in control of the vehicle, he could consent to a search of the vehicle, but did not have to.  Deputy Rhodd testified that he immediately asked a second time if he could

6

search the vehicle, and in response Guerrero extended both hands sideways, with his palms up.  The officer believed Guerrero also gave verbal consent, but could not recall the words he used.  He also asked Guerrero to ask Torres in Spanish if he would consent to a search, and Guerrero immediately stated something in Spanish to Torres, who looked at the officer and nodded his head up and down.  Deputy Rhodd construed these actions as consent, so proceeded to search the vehicle without any protest from either defendant.

In contrast, Guerrero testified that after the initial request to search, Deputy Rhodd asked a second time, and Guerrero told him "no," but did not use that word, and did not recall the specific words he did use.  When Deputy Rhodd asked a third time, saying "Can I search the car, yes, yes," Guerrero was surprised and gave no verbal response, but shrugged his shoulders and put the palms of his hands in an outward position.  He intended these acts to signify that he was being submissive because he believed the officer was going to search the car anyway.

Guerrero testified that when Deputy Rhodd asked him to ask Torres in Spanish if Torres would consent to a search of the car, Guerrero told Torres that the officer wanted to search the vehicle, but Torres' nodding of his head merely indicated Torres' understanding of the request, not his consent to search.  Guerrero stated that Officer Rhodd never told him that he could refuse consent to

search, and he felt he had no choice so never protested during the search.

Guerrero testified that he had felt detained from the moment the officer had moved

his patrol car next to his,[1] which the court believes was approximately 10-12

minutes after the initial encounter and prior to the request for consent to search.

Officers eventually located approximately 4.5 kilograms of

methamphetamine near the gas tank.  Soon thereafter, defendant Torres walked

toward the building, then ran away before being chased and captured by another

officer.

## MOTIONS TO SUPPRESS

Both motions seek to suppress only the items found in the vehicle.

Defendants contend that the officer's questioning of the defendants was non-

consensual, that the officer lacked reasonable suspicion of any criminal activity,

that defendants gave no consent to search the vehicle and consent, if any, was a

product of the illegal detention, warranting suppression of the evidence.

### Lawfulness of initial questions

The court first examines defendants' contention that Deputy Rhodd's

questioning of the defendants prior to the search was non-consensual and

---

[1]The officer testified that he had moved his car next to defendant's vehicle
before the search so he could sit in it and watch defendants because it was cold
outside.

constituted a detention unsupported by reasonable suspicion.

The distinction between a consensual encounter and a detention is well established.

"A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996). Supreme Court precedent is clear "that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual.' " *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "A police officer does not have to inform the citizen they are free to disregard any further questioning for the encounter to be consensual." *United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir.2003) (citation omitted), *cert. denied*, 541 U.S. 911, 124 S.Ct. 1622, 158 L.Ed.2d 259 (2004). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In deciding if a police-citizen encounter amounts to a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir.1999) (quoting *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382), *cert. denied*, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000). Put another way, "[a] person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way." *United States v. Hernandez*, 93 F.3d at 1498 (citation omitted). "[E]very case turns on the totality of the circumstances presented." *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir.1994). Factors relevant to whether a reasonable person would not feel free to terminate the encounter with police include: the threatening presence of

several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects; a request to follow the officer to the station; interaction in a nonpublic place; and absence of other members of the public. *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir.1996). No one factor is dispositive in this analysis. *United States v. Glass*, 128 F.3d 1398, 1406 (10th Cir.1997). "An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.' " *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994)), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998).

*United States v. Olivas*, 351 F.Supp.2d 1180, 1185 -1186 (D.Kan. 2004).

None of the factors pointing toward a detention is present in this case at any time prior to the officer's taking of defendants' documentation. No traffic stop occurred here. Deputy Rhodd approached the defendants in a public place without any show of force or use of aggressive language, and asked to speak to them. Sergeant Bronaugh was not involved in the encounter until after the search of the vehicle began. Until then, he remained some distance away, did not converse with either defendant, and did not interfere with either defendant's freedom of movement.

At some point, Deputy Rhodd moved his patrol car next to defendants' vehicle at the gas station, but the record does not reflect that the police activated a siren or flashers or that they commanded respondent to halt, or

displayed any weapons, or that they operated the car in an aggressive manner to block defendant's exit or otherwise convey that defendants were not free to leave. This action, although intimidating, does not amount to a seizure under these facts. *See Michigan v. Chesternut*, 486 U.S. 567, 575 (1988) (finding that a police car's driving parallel to a running pedestrian could be intimidating, but does not constitute a seizure).

The Supreme Court has long recognized that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216 (1984); *See Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, --- U.S. ----, ----, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").   Because the test is an objective one, Guerrero's reliance on his subjective belief to support his claim of an illegal detention is misplaced. *See United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir.1996). The court finds that a reasonable person would have believed he was free to leave before Deputy Rhodd asked for defendants' identifications and the vehicle registration.

Assuming, arguendo, that the voluntary encounter turned into a

11

detention for the period of time that the officer had possession of defendants'
identifications and vehicle registration, the court examines whether Deputy Rhodd
had reasonable suspicion warranting the detention of the defendants.

It is permissible for an officer to detain a driver for further questioning
"if he has an objectively reasonable and articulable suspicion illegal activity has
occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th
Cir.1998).  "Reasonable suspicion is a minimal level of objective justification which
the officers can articulate, as distinct from an inchoate and unparticularized
suspicion or hunch." *United States v. Valles*, 292 F.3d 678, 680 (10th Cir.2002)
(internal quotation marks omitted).

Here, the officer articulated that given his experience, the following
factors contributed to his suspicion that defendants were involved in transporting
drugs: 1) the disparity between the defendant's ages; 2) the disparity between
defendants' dress; 3) the conflict between defendant's statements as to their trip
and its purpose; 4) Guerrero's lack of familiarity with the vehicle's registered
owner; 5) the dress clothes piled in the back seat; 6) the sole key on the ring; 7) the
religious paraphernalia in the vehicle: 8) the unusual nature of Guerrero's dress
given the inclement weather; 9) Guerrero's unabated nervousness, and 10)the fact
that Los Angeles is a source city for drugs.  These factors provide an objectively

12

reasonable and articulable suspicion that defendants were involved in illegal activity,

warranting the detention for the purpose of checking the identification and

registration, and the questions that followed.

Neither the length of the detention nor its  scope exceeded the

permissible bounds of *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The record shows

that Deputy Rhodd had defendants' documents for 10-12 minutes, and that

defendants were asked no questions during that period of time.

When the officer returned the documentation, thanked defendants for

their time, and took some steps toward the rear of the car, any detention ended.

*See United States v. McKneely*, 6 F.3d 1447 (10th Cir.1993).  At that point, the

relationship between the defendants and the officer was a consensual encounter

once again.  Deputy Rhodd returned the identifications and registration, thanked

defendants for their time, then asked permission to ask additional questions without

further constraining the defendants by any show of authority.

Although thanking defendants for their time is not as express as

telling defendants they are free to go, it is sufficient under the circumstances here to

convey to defendants that any seizure had ended and they were free to go.  There is

no evidence of a coercive showing of authority by Deputy Rhodd's actions, tone

of voice, or words as to lead either defendant to reasonably believe that he had to

answer the deputy's questions before he could leave.  A reasonable person in the defendants' situation would likely have felt free to refuse the deputy's request to answer additional questions and to leave the scene.   Because the officer's  conduct would not have conveyed to a reasonable person that he was not free to decline the officer's requests or otherwise terminate the encounter, *see United States v. West*, 219 F.3d 1171, 1176 (10th Cir.2000), there was no illegality to taint any consent given by them.

### Consent

The court turns to defendants' contention that they did not consent to Deputy Rhodd's request to search the car and, in the alternative, that any consent given was not voluntary.

### Defendant Torres

The court first examines whether defendant Torres has standing to challenge the search of the vehicle.  It is well established that where a defendant fails to establish his lawful ownership or possession of the vehicle, he lacks standing to challenge the search of the vehicle.  *See United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir.1996) (defendant has no reasonable expectation of privacy in a vehicle unless he proves he had lawful ownership or possession of the vehicle at the time of the search), *rev'd on other grounds*, *United States v.*

14

*Holland*, 116 F.3d 1353 (10th Cir.1997); *United States v. Arango*, 912 F.2d 441,

446 (10th Cir.1990) (defendant had no standing to object to search of a vehicle

where he had failed to establish lawful ownership or possession of the vehicle);

*United States v. Erwin*, 875 F.2d 268, 271 (10th Cir.1989) (same).

Here, no evidence was presented to show that defendant Torres had

either lawful ownership or lawful possession of the vehicle, or that he had a

possessory interest in the drugs found, or otherwise had a reasonable expectation

of privacy in the vehicle.  Torres thus lacks standing to challenge the search of the

vehicle.  *See United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001).

In the alternative, the court does not believe that defendant Torres

claims that his lack of English skills renders his consent involuntary.  In the event

the court errs in that conclusion, it finds this defendant's consent valid because the

facts show that defendant understood English well enough to respond to the

officer's requests.  *See United States v. Sanchez-Valderuten*, 11 F.3d 985, 990-91

(10th Cir.1993) (finding adequate "receptive English language skills" to consent to

the search, despite defendant's difficulty in speaking English); *United States v.*

*Corral*, 899 F.2d 991, 994 (10th Cir.1990) (defendant with limited knowledge of

English voluntarily consented because he understood the officer's questions,

answered questions in English and demonstrated an overall working knowledge of

English).

Even assuming that Torres lacked sufficient English skills to consent, the record shows that Deputy Rhodd asked Guerrero to ask Torres in Spanish if he would consent to a search, and Guerrero immediately stated something in Spanish to Torres, who replied by looking at the officer and nodding his head up and down. Given the totality of the circumstances, a reasonable officer would have believed he had received consent to search from Torres.

### Defendant Guerrero

No challenge is made to Guerrero's standing to challenge the search of the vehicle. The sole issue is whether Guerrero did in fact voluntarily consent to the search.

If the person in control of a car voluntarily consents to its search, the officers may search the car without a warrant and not violate the Fourth Amendment. *United States v. Taverna*, 348 F.3d at 878. Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez*, 93 F.3d at 1500.

For this exception to apply, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993). The government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Under the two-part test for determining whether consent to search was given, the government must: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely

and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." *United States v. Taverna*, 348 F.3d at 878. This determination is made upon considering the totality of the circumstances. *Schneckloth*, 412 U.S. at 225-27, 93 S.Ct. 2041.

*Olivas*, 351 F.Supp.2d at 1186.

Consent need not be express or verbal. *See United States v. Benitez*, 899 F.2d 995 (10th Cir.1990) (affirming trial court's decision not to suppress the fruits of a search where the defendant gave non-verbal consent).  Instead, gestures or other non-verbal conduct can be found to constitute sufficient consent.

Gestures are often ambiguous, and at least one court has concluded that a shrug without more is insufficient to show one's consent to search. *State v. Harris*, 642 A.2d 1242, 1246-47 (Del. Super. Ct. 1993). Other courts, however, have accepted shrugs and similar gestures as sufficient evidence of consent.  *E.g., United States v. Wilson*, 895 F.2d 168, 172 (4th Cir.1990) (defendant shrugged his shoulders and raised his arms when asked for consent to pat-down search); *see United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976) ("[t]he consent [to search] may be in the form of words, gesture, or conduct"), *citing Robbins v. MacKenzie*, 364 F.2d 45, 48-49 (1st Cir .), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966).

*United States v. Raibley*,  243 F.3d 1069, 1076 -1077 (7th Cir.), *cert. denied*, 534 U.S. 876 (2001).  *See United States v. Crews*, 30 F.3d 131, 1994 WL 396339, *1 (4th Cir.1994) (affirming finding of voluntary consent where defendant said nothing in response to request to search his person, but raised his hands to one side, in a manner and presentation as if he were opening up his arms.)

Even when a defendant verbally refuses consent, his subsequent or

contemporaneous actions may be found sufficient to constitute consent.

Consent has also been found where a defendant's actions reasonably indicated consent, even though he verbally refused to consent to a search. *See, e.g., United States v. Flores*, 48 F.3d 467, 468-69 (10th Cir.) (defendant consented to search of his car trunk by opening the trunk after refusing the police's first request to search); *Lee*, 1996 WL 391877, at *3 (defendant consented to search of shopping bag where she verbally refused to consent but handed the bag to the agent).

*United States v. Carreno-Arias*, 2002 WL 31890949, *5 (S.D.N.Y. 2002).

Given the totality of the circumstances surrounding the encounter, the court finds that a reasonable law enforcement officer would have understood defendant's actions to indicate his voluntary consent to the search. Although defendant Guerrero initially refused to consent, it is uncontested that this was because he believed he had no authority to consent to a search since the vehicle did not belong to him. That rationale was removed when the officer correctly informed him that he could, in fact, give consent, since he was in possession of the vehicle. *See United States v. Allen*, 235 F.3d 482, 489 (10th Cir.2000) (standing is proper where defendant shows legitimate possessory interest in or a lawful control over the car).

The court does not find Guerrero's testimony credible to the extent he stated that the officer asked him a second time for consent and he replied negatively without saying "no," and did not recall what words he used. The court finds that

18

when the officer asked defendant a second time for consent, defendant said

nothing, but opened his hands in a manner which a reasonable officer would have

construed as consent to search.  Defendant admitted that he intended for his

gestures to be viewed as submission to the officer's request, and the officer

testified that he relied upon these gestures, in conjunction with Guerrero's verbal

agreement to the search, as such.

Guerrero places great weight on the fact that he felt detained and on

the officer's testimony that he would not have permitted defendants to leave, had

they refused consent to a search.  These subjective beliefs, although part of the

totality of circumstances examined by the court, are not controlling.

> It is irrelevant that [the officer] actually would not have let the defendant go, as long as the defendant consented while believing he was free to leave. Moreover, [the officer] need not have specifically told the defendant that he was "free to go" because his other words were of the same effect.  *Id.* at 1177.

*United States v. Garcia-Rodriguez*, 127 Fed.Appx. 440, 446, 2005 WL 752728,

*4 (10th Cir.2005).

The court finds it significant that neither defendant objected during the

search of the vehicle.  *See United States v. Pena*, 920 F.2d 1509, 1515 (10th

Cir.1990).  There is no evidence in the record that either defendant objected to or

expressed concern about the officers' search activities or that either defendant

19

attempted to limit or retract his consent.  Consent is not rendered involuntary by

one's belief that officers are in complete charge of the situation and thus it would

do no good to object.  *See United States v. Luna-Santana*, 128 Fed.Appx. 42,

2005 WL 806720 (10th Cir. April 8, 2005).  The court finds that defendant Guerrero

freely and intelligently gave unequivocal and specific consent, without implied or

express duress or coercion.

**MOTION TO DISMISS**

Defendant Torres moves to dismiss the case based on racial profiling.

As a predicate to his challenge, he asks the court to grant an evidentiary hearing and

to order limited relevant discovery, as well as an opportunity to supplement the

facts alleged in the memorandum.  Torres moves the court to require the

government to produce a host of information for his inspection and copying which

will not be set forth in detail herein.  *See* Dk. 32, p. 10-11.

The threshold standard for obtaining such discovery is set forth in

*United States v. Armstrong*, 517 U.S. 456 (1996):

> A defendant who claims he was targeted for prosecution because of race is
> entitled to discovery on that claim only if he presents "some evidence tending
> to show the existence of the essential elements" of the selective prosecution
> defense, *i.e*., discriminatory effect and discriminatory intent.

*United States v. James*, 257 F.3d 1173, 1178 (10th Cir.2001) (quoting *Armstrong*,

517 U.S. at 468).

This standard, although it requires only "some evidence," is significant.

> ... the defendants need not establish a prima facie case of selective prosecution to obtain discovery on these issues. (citations omitted). Nevertheless, given the heavy burden that discovery can impose on the government, *see Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480, 134 L.Ed.2d 687, the showing necessary to obtain discovery for a selective prosecution defense must "itself be a significant barrier to the litigation of insubstantial claims," *id.* at 464, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687.

*James*, 257 F.3d at 1178.  Torres thus has the burden to show some evidence tending to show both disparate effect and discriminatory intent.

Torres' claim of racial profiling is based upon a report which this court previously found to be fatally flawed.  *See United States v. Alcaraz-Arellano*, 302 F.Supp.2d 1217 (D. Kan. 2004).  This is the "Racial Profiling Study and Services: A Multijurisdictional Assessment of Traffic Enforcement and Data Collection in Kansas" (John C. Lamberth, Ph.D., Police Foundation, 2003), requested by the Kansas legislature in 2000, *see* Kan. L.2000 Ch. 180, commonly referred to as the "Lamberth study."

Torres fails to articulate any reason why the Lamberth study's conclusions regarding racial profiling in traffic stops should apply to this case in

which no traffic stop was made.  Nor does Torres assert that any of the court's previous findings regarding that report were in error.  Torres does not show the court why that study is any more reliable or trustworthy  today than it was when this court decided the *Alcaraz-Arellano* case.  Nor does the record in this case show either disparate effect or discriminatory intent.

Because the threshold showing required in *Armstrong* is not met, defendant's motion for discovery shall be denied. Accordingly, there is no basis for granting defendant's motion to dismiss or permitting the discovery he seeks relating to racial profiling.

IT IS THEREFORE ORDERED that the motions to suppress (Dk. 24 & 25) are denied; the motion to dismiss indictment (Dk. 32) is denied; and the motions to join (Dk. 26 & 37) are granted.

Dated this 22nd day of June, 2005, Topeka, Kansas.

s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge

22